The document below is hereby signed.

Signed: December 15, 2014



*S. Martin Teel Jr.*

S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                            )
                                 )
GST, LLC,                        )   Case No. 13-00705
                                 )   (Chapter 11)
            Debtor.              )   **Not for Publication in**
                                 )   **West's Bankruptcy Reporter**

MEMORANDUM DECISION AND ORDER RE STABILIS FUND II, LLC'S
MOTION FOR RECONSIDERATION OF ORDER CONFIRMING
DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

Stabilis Fund II, LLC, has filed a *Motion for
Reconsideration of Order Confirming Debtor's Second Amended
Chapter 11 Plan* (Dkt. No. 102).  The motion, which Stabilis has
brought under Fed. R. Civ. P. 59, made applicable in this case
pursuant to Fed. R. Bankr. P. 9023, contends that the evidence
presented by the debtor was legally insufficient to support the
court's conclusion that the plan "is not likely to be followed by
the liquidation, or the need for further financial
reorganization, of the debtor or any successor to the debtor
under the plan, unless such liquidation or reorganization is
proposed in the plan."  11 U.S.C. § 1129(a)(11).  As explained in
more detail below, the debtor offered legally sufficient evidence

of the second amended plan's feasibility, the court appropriately weighed the evidence, taking into account numerous factors relevant to feasibility, and Stabilis's motion offers no persuasive grounds for the court to vacate its order confirming the debtor's plan.

I

On September 3, 2014, the court held a hearing to address confirmation of the debtor's Second Amended Chapter 11 Plan of Reorganization. The plan proposed to pay Stabilis, the holder of a secured claim in the amount of $987,117.72, payments based upon a 30 year amortization schedule at a 6.25% per annum interest rate, but with a balloon payment coming due in ten years after the effective date of the plan.  Stabilis objected on the grounds that the plan was not feasible and that the debtor failed to satisfy the requirements of cramdown.[1]  In its motion for reconsideration, Stabilis takes issue with the court's finding of feasibility under 11 U.S.C. § 1129(a)(11), contending that the debtor failed to make an adequate non-speculative showing that it could fund the plan.

---

[1]  Stabilis objected that the plan failed to meet the requirements for cramdown under 11 U.S.C. § 1129(b) because the interest rate of 6.25% per annum, which the debtor proposed to pay Stabilis under the plan, was inadequate to compensate Stabilis for the risk of default given the debtor's lack of equity in the collateral securing the debt.  The court ultimately overruled that objection and Stabilis's motion for reconsideration does not ask the court to reconsider its ruling on that issue.

A.

Section 1129(a)(11) requires the court to find, as a condition of confirmation, that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This provision goes to the feasibility of the plan, and requires the court to find that "the plan offers a reasonable assurance of success." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). Although there must be reasonable assurance of success, "[s]uccess need not be guaranteed." *Id. See also In re DBSD North Am., Inc.*, 634 F.3d 79, 106-07 (2d Cir. 2011) (a plan can offer a reasonable assurance of success notwithstanding that there remains some possibility of liquidation or further reorganization).

The debtor's plan contemplates a balloon payment after 10 years, which the debtor intends to fund through a refinancing of the property. Although the plan does not require the balloon payment to be made until 10 years after the effective date, the debtor's principal testified that he hopes to be able to refinance the property in as few as three years. As set forth in *Chelsea State Bank v. Wagner (In re Wagner)*, 259 B.R. 694, 671

(B.A.P. 8th Cir. 2001),[2] a case relied upon by both parties in this dispute, courts consider several factors when evaluating the feasibility of a plan whose funding relies upon an eventual balloon payment, including:

> the future earning capacity and disposable income of the debtor, whether the plan provides for payment of interest to secured creditors, the debtor's perseverance and motivation to execute the plan successfully, the type of employment in which the debtor is engaged or may become engaged, whether the plan includes a cushion for unexpected expenses, the equity in the property, whether the plan provides for recurring charges against the property, and whether the plan provides for payments to the creditor which will significantly reduce the debt and enhance the prospects for refinancing at the end of the plan.

*Id.* at 671.  At the confirmation hearing, after hearing evidence and argument from the debtor and Stabilis, the court addressed each of these factors in turn.  First, the court addressed whether the debtor will be able to generate sufficient income to pay its debts, and the court found that it would.  Second, the court found that the plan provided for payment of interest to secured creditors.  Third, the court found that the debtor demonstrated the necessary perseverance and motivation to perform under the plan, explaining that the court found George Thanos, the debtor's principal, to be a credible witness who was committed to the plan's success.  Fourth, when considering the

---

[2]  Although *Wagner* was a chapter 13 case, the factors identified by the *Wagner* court are equally applicable in the context of a chapter 11 case.

business in which the debtor is engaged, the court observed that

the debtor is essentially a landlord renting to a residential

tenant and a commercial tenant, and the evidence showed that the

rent would be stable.  Fifth, the court found that the plan

provided an adequate cushion for unexpected expenses, with that

cushion consisting of a built-in assumption of a five percent

vacancy rate, and allowing $36,000 for capital expenditures over

the 10-year life of the plan.  Sixth, the court considered the

equity in the property.  Although currently there is almost no

equity, the court found that even if the property does not

appreciate in value over the next ten years, between the monthly

payments to Stabilis and Thanos's monthly equity contribution of

$1,000, as well as plan payments that will eventually satisfy the

real estate taxes that constitute a superior lien against the

property, when the ten year mark arrives, there will be at least

an 84% loan to value ratio, enhancing the debtor's prospects for

refinancing.  The court also noted that it was extremely unlikely

that the collateral would decline in value, with the evidence

suggesting that it will instead increase in value.  Seventh, the

court considered whether the plan accounted for recurring charges

against the property.  The court found that it did, citing as an

example the real estate taxes, which will be paid by Imperial

Valet Services, Inc., the proposed commercial tenant.  Taking all

of these things into consideration, the court concluded that the

debtor had met its burden to show that the plan is feasible under
§ 1129(a)(11).

B.

The failure to produce a lease did not bar the debtor from
offering testimony of the debtor's intent to lease its commercial
space to Imperial as a means of funding the plan.

The funding of the debtor's plan relies heavily upon the anticipated rental income from the debtor's proposed commercial tenant, Imperial Valet Services, and Stabilis's first challenge to the court's finding of feasibility goes to the adequacy of the debtor's showing regarding Imperial's obligation and ability to perform under the anticipated commercial lease.

At the confirmation hearing, the debtor put on evidence showing that it will have two sources of rental income arising from its sole asset, a two-story townhouse with a basement located at 1963 Calvert Street NW, Washington D.C. 20009.  First, the debtor receives monthly rental income under a residential lease of the building.  The residential unit has been in strong demand over the last several years, and the court concluded that this income would be a steady and reliable source of income over the life of the plan.  The second source of rental income will be from the commercial real estate of the basement and first floor of the debtor's building.  Imperial intends to lease the debtor's commercial space, where it will operate a dry cleaning business on the first floor.  Imperial has also negotiated a sublease for

6

a shoe manufacturer to rent out the basement in exchange for monthly payments in the amount of $1,000, payable to Imperial. Imperial's monthly rental obligation to the debtor will be $5,200.

At the hearing, George Thanos, the debtor's principal and the sole owner of Imperial, testified regarding the forthcoming commercial lease between the debtor and Imperial.  The debtor did not, however, provide a copy of the lease and Stablis contends that under Fed. R. Evid. 1002, the debtor was required to produce an original copy of the lease or account for its non-production if it sought to introduce evidence relating to the terms of the lease.  Similarly, Stabilis contends that because Thanos testified that the Imperial lease would have an initial term of ten years, whereas the disclosure statement specified that it would be an initial term of 5 years, the court ought to give minimal weight to any testimony regarding Imperial's obligations under the lease.

The Best Evidence Rule provides that "the production of the original document is required to prove the contents of a writing."  Fed. R. Evid. 1002.  The rule does not apply, however, "[i]f a witness's testimony is based on his first-hand knowledge of an event as opposed to his knowledge of the document . . . ." *Waterloo Furniture Components, LTD. v. Haworth, Inc.*, 467 F.3d 641, 648-49 (7th Cir. 2006).  "The best-evidence rule does not

7

apply where a party seeks to prove a fact which has an existence independent of any writing, even though the fact might have been reduced to, or is evidenced by, a writing." *JAG Consulting v. Eubanks*, 72 S.W.3d 549 (Ark. Ct. App. 2002).

Here, in order for the debtor to demonstrate its ability to fund the plan, it was not necessary to prove the terms of a commercial lease between Imperial and the debtor.[3]  It was sufficient that the debtor show the likelihood of generating sufficient rental income to support the funding of the plan. Independent of the existence of a signed lease, the debtor offered the testimony of George Thanos demonstrating the mutual intent and likelihood that Imperial would be permitted to operate a dry cleaning operation on the debtor's premises with a sufficient profit margin to support an adequate rental fee to fund the plan.  Production of an executed lease was not essential to the court's finding of feasibility.  The court placed weight on Thanos's credibility and his stated intent and desire to fund the plan through the operation of a dry cleaning business on the

---

[3]  It is noteworthy that Thanos, who testified at length both as the debtor's representative and as the representative of Imperial, had the ability to bind both parties to the terms of a lease between the parties.  This was not a case where a debtor proposed to fund its plan with rental income from a non-insider whose commitment to be a party to a lease was at issue or in dispute.  Here, both parties to the lease (whether signed and executed or merely contemplated) were represented on the stand and the mutual commitment of the debtor and Imperial to permit Imperial to operate on the premises on the terms stated was not legitimately in dispute.

first floor of the debtor's property, and the failure to produce
the lease itself does not render inadmissible Thanos's testimony
in that regard.  Likewise, whether the initial term of the lease
was five years or ten years, the evidence shows that the debtor
and Imperial both intend for Imperial to be a long-term tenant,
and the discrepancy identified by Stabilis does not alter the
court's feasibility analysis.

C.

Imperial's projected revenue for its operation on the debtor's
premises is based on the witness's knowledge and experience in
the industry, not mere speculation.

Stabilis complains that Imperial's projected average monthly
net profit was mere conjecture given that, at the time of the
confirmation hearing, Imperial had not commenced operations on
the debtor's property.  Thanos, however, testified that he has
been in the dry cleaning business for several decades, and that
Imperial has been providing dry cleaning services in the District
of Columbia for even longer.  On the stand, Thanos demonstrated
extensive knowledge of the business and gave concrete examples of
why a dry cleaning operation at the debtor's property would
benefit from economies of scale arising from the scope of
Imperial's market penetration, and how his reliance on dry
cleaning equipment located off site would increase the profit
margin for such a business.  Historic revenues may be preferable,
but that does not render well-supported projections meaningless,

9

and the court found Thanos's testimony to be grounded in business experience and not merely pie in the sky projections offered to create an illusion of feasibility.

D.

The debtor's projected income is sufficient to cover plan
payments and operating expenses.

Stabilis's motion for reconsideration contends that the court erred in finding that the debtor's income would be sufficient to cover plan payments and operating expenses. Stabilis takes issue with several specific aspects of the debtor's projections.

1. The evidence reflects that Imperial will be responsible for paying property taxes.

First, Stabilis notes that if Thanos's optimistic outlook for property value appreciation comes to pass, the real estate taxes associated with the debtor's property could increase from $14,264.25 to as much as $20,254.88. That is a difference of approximately $6,000. Stabilis argues that without the lease, we do not know whether Imperial will remain obligated to pay the real estate taxes regardless of how much those taxes increase. Stabilis also contends that there is no evidence of Imperial's ability to pay taxes should those taxes increase by a significant amount. The evidence as to Imperial's obligation to pay the real estate taxes was the testimony of Thanos that Imperial agreed to

pay the real estate taxes.  There is nothing in the record
purporting to cap the amount of Imperial's obligation in the
event the tax obligation increases.  As for Imperial's ability to
pay, Exhibit B, which was offered by the debtor and received into
evidence by the court, is a statement of Imperial's combined
profit and loss for the two dry cleaning facilities it currently
operates, which shows a monthly net income of $4,875.25.  Even
without taking into account Imperial's projected profit of
between $4,000 and $8,000 at the debtor's Calvert Street
location, Imperial is currently operating with a sufficiently
healthy profit margin that it would be financially able to
shoulder the burden of an increase in property taxes associated
with its operations at the debtor's Calvert Street location.

> 2.   The debtor did not improperly fail to include an
>       expense for water and sewer in its budget.

Stabilis complains that there is no evidence as to whether
Imperial will be responsible for water and sewer expenses for the
building.  Stabilis contends that the debtor's proposed budget
introduced at the hearing does not account for payment of water
and sewer charges, whereas the debtor's November 13, 2013 budget
provides for a monthly water and sewer expense of $250.  Stabilis
did not raise this issue at the hearing, and there is thus no
express finding by the court regarding the water and sewer
expenses for the building.  Nevertheless, it was within the
court's discretion to infer, based upon the contemplated

11

commercial lease with Imperial coupled with the absence of a line
item on the budget for the payment of such utilities, that
Imperial, as the tenant, would be responsible for the water and
sewer expenses.  The debtor's response to Stabilis's motion
confirms, as inferred by the court, that Imperial has placed the
utilities in its name.[4]

The debtor also takes issue with Stabilis's assertion that
the absence of the water and sewer expense in the debtor's
current budget contradicts the November 13, 2013 budget submitted
by the debtor.  Although the November 13, 2013 cash collateral
budget filed by the debtor did include a $250 expense for water
and sewer, the debtor contends that the entry was a mistake and
was later corrected.  The record supports the debtor's position.
On December 12, 2013, the court held a hearing to address
Stabilis's Motion to Prohibit Use of Cash Collateral.  The
court's hearing sheet summarizing what transpired at the hearing
attaches a copy of the debtor's budget, on which is listed a $250
expense for water and sewer.  As noted by the debtor, the budget
attached to the hearing sheet has been marked up and there is a
line crossing out the water and sewer expense from the budget.[5]
Consistent with the marked up copy of the budget attached to the

---

[4]  The court is mindful that the response is not supported
by an affidavit and I am not treating the statement as evidence.

[5]  The hearing sheet is not an order, and is intended only
as an informal summary of what transpired at the hearing.

court's hearing sheet, the proposed cash collateral order
submitted by the debtor following the hearing, and which was
ultimately signed by the court, omitted the $250 water and sewer
expense.  Thus, it appears that by December 2013, the debtor had
already taken the position that it is not responsible for the
water and sewer expenses associated with the property.  Stabilis
has not shown that the omission of the water and sewer expense
from the debtor's current budget is an error, or that the debtor
has otherwise failed properly to account for this expense.

3.    Stabilis's contention that the plan is not feasible
      because Imperial's loan repayments to the debtor will
      cease prior to the debtor's completion of the Class III
      real estate repayments ought to have been raised at the
      confirmation hearing to allow the debtor to respond and
      to permit the court to evaluate the significance of the
      potential budget shortfall in the larger context of plan
      confirmation.

Stabilis questions whether the $573.24 monthly loan
repayments from Imperial to the debtor will, in fact, continue
for 30 months after the effective date of the Plan, as
represented by the debtor.  Stabilis further notes that even if
those payments continue for 30 months after the effective date of
the plan, the Class III real estate payments will not be
completed until 36 months after the effective date, leaving the
debtor with a shortfall of $291 for six months starting 30 months
after the effective date of the plan.  The debtor's opposition to
the motion does not deny that the loan repayments will stop
before the debtor has completed the Class III real estate

13

payments, but is quick to note that rent escalations during that time will be more than adequate to cover the shortfall.  Although Stabilis is correct that there could be a budget shortfall during the period between when the loan repayments cease and the Class III real estate payments are complete, the debtor ought to have had an opportunity to respond to such a challenge at the hearing. Although not received as evidence, the debtor's explanation in its response is a plausible explanation for how the debtor would offset the potential shortfall during the relevant time period. Given the modest amount at issue, the relatively short duration of time the budget will be exposed to the possible shortfall, and the fact that the debtor did not have a fair opportunity to respond to the challenge at the confirmation hearing, the court rejects this as a basis for finding the debtor unable to meet its expenses.

4.   The possibility that a holdover tenant will fail to vacate the debtor's commercial space was already rejected as a basis for denying confirmation.

Stabilis complains that a holdover tenant in the debtor's commercial real estate unit could interfere with the debtor's ability to rent that unit to Imperial, thus interfering with the debtor's ability to meet its expenses and fund the plan. Stabilis raised this issue at the confirmation hearing, and the court was mindful of this objection when it found that the debtor was both willing and able to rent the commercial unit to

14

Imperial.   Thanos testified that the holdover tenant was aware of
these bankruptcy proceedings and would vacate the premises to
allow Imperial to take possession.   The court credited that
testimony, and Stabilis did not present evidence to persuade the
court that the holdover tenant was likely to interfere with
Imperial's occupation of the premises.   The court rejects this
argument accordingly.

E.

1.   The debtor's projections encompassed an adequate time
frame to permit the court to evaluate plan feasibility.

In challenging the feasibility of the debtor's plan,
Stabilis complains that the debtor's expense projections were
limited to a one-year time horizon, yet the term of the plan is
10 years.   The question of the appropriate time frame for
analyzing a debtor's viability is a mixed question of fact and
law that must be considered by the court on a case-by-case basis.
*S&P, Inc. v. Pfeifer*, 189 B.R. 173 (N.D. Ind. 1995).   Here, the
court accepted the debtor's projections for the first year of the
plan as an accurate representation of the likely income and
expenses of the debtor on a forward going basis.   The court is
mindful that both of these variable are subject to fluctuation
over time, but for purposes of analyzing feasibility, the one-
year time horizon gave the court a meaningful framework within
which to assess whether the debtor's income will generally be in

15

line with its expenses.  Here, the debtor's business is fairly
straightforward, and consists of the debtor acting in its
capacity as a landlord of two units, with rental income coming
from a residential tenant occupying the second floor and from a
commercial tenant occupying the first floor and basement.  The
debtor's ability to succeed under the plan depends on its ability
consistently to rent these two units at an adequate rental rate
such that it can perform under the plan while meeting its other
obligations.  The court did not require the debtor to show 10
years' worth of projections, because such projections were
unlikely to add anything of material significance to the
financial picture of the debtor beyond what the debtor presented
with respect to the projected income and expenses of the first
year.  When considering all of the circumstances, the debtor's
evidence was sufficient to provide the court reasonable assurance
that the plan is feasible.

2.    The court found Thanos's testimony credible especially
regarding the business model associated with the dry
cleaning operation Imperial intends to operate on the
debtor's premises.

Stabilis takes the position that the court ought not place
significant weight on Thanos's testimony regarding the debtor's
ability to fund the plan because he is the debtor's principal and
the evidence is largely conclusory.  The court, however, was more
concerned with Thanos's testimony in his capacity as the owner
and operator of Imperial, a dry cleaning business that has

16

operated in the District of Columbia for many decades, not just
in his capacity as the principal of the debtor.  The debtor's
plan relies heavily on the ability of Imperial to operate a
profitable dry cleaning business on the debtor's property.  While
courts ought to limit the weight given to conclusory testimony
offered by unrealistically optimistic debtors in support of
confirmation, they are not required to disregard the historic
success of a related entity simply because that entity is owned
by the debtor's principal.  Likewise, while the debtor in this
case is a landlord, when serving in his capacity as Imperial's
principal, Thanos wears the hat of a businessman with substantial
experience in the dry cleaning industry.

F.

1.  The debtor's budgeted capital expenditures were
    adequate.

In its motion, Stabilis complains that the debtor's proposed
budget submitted in November 2013 contains a $500 monthly line
item for miscellaneous maintenance, the April 2014 budget
contains a $400 monthly line item for capital expenditures, and
finally the budget introduced at the confirmation hearing
contains a $300 monthly line item for capital expenditures.
Stabilis contends that this downward adjustment undermines the
reliability of the debtor's testimony as to the sufficiency of
the $3,600 a year that the debtor has budgeted for capital
expenditures.

17

Although the debtor's downward adjustment of its budgeted capital expenses could bear on the court's assessment of whether the figure the debtor ultimately proposed was reliable, all of the proposed budgets identified by Stabilis in its motion were part of the record in this case at the time of the confirmation hearing. Stabilis made several arguments at that hearing as to why the proposed amount was an unrealistically low estimate of the capital expenditures that would be required of the debtor. The debtor, in turn, offered ample testimony in support of its position that the amount was adequate. The court's finding that the amount budgeted by the debtor for capital expenses was adequate was based on evidence regarding the age and condition of the property, and the maintenance and repair costs the debtor was likely to encounter. Stabilis's newly asserted basis for skepticism - the downward adjustment over time of the budgeted capital expenses - does not render the evidence upon which the court relied at the hearing legally insufficient to support the finding. The court rejects this as a basis for finding that the plan is not feasible.

2.  The fact that the debtor would be responsible for paying a $1,000 insurance deductible if a tree falls on the property does not render the capital expense reserves insufficient.

Similarly, Stabilis notes that the debtor's insurance policy has a $1,000 per incident deductible, and if an insurable event takes place, the budget does not expressly provide for this kind

of expense.  When asked on the stand if he foresaw any expenses
that would not be covered by the $3,600 annual capital
expenditure reserve, Thanos stated that an event such as a tree
falling on the property would not be covered.  He went on to
explain, however, that insurance would cover such an event.
Although the extensive damage imagined in the case of a tree
falling would not be covered by the reserves, Thanos did not
testify as to whether the reserves would be sufficient to cover
any associated insurance premium.

Stabilis now points to the insurance deductible in support
of its contention that the debtor's budget under-funds the
capital reserves.  There is no evidence with respect to the
likelihood of such an insured event taking place, other than
Thanos's observation that there are many trees in the area.  The
record is likewise silent with respect to whether the reserves
would be adequate to absorb this kind of one-time expense, which
may or may not arise.  Stabilis has not shown that the capital
expenditure reserves are insufficient to cover the insurance
deductible, and the court, considering all of the circumstances
in the case, is likewise not persuaded that the mere possibility
of the debtor being exposed to a one-time liability of $1,000 for
which the budgeted capital reserves may or may not be sufficient
constitutes grounds for finding that the plan is not feasible.

III

Stabilis challenges the adequacy of the debtor's showing
with respect to the debtor's ability to refinance the property
when the balloon payment comes due.  The debtor offered evidence
in support of two possible refinancing scenarios, one that would
occur ten years after the effective date of the plan, by which
time the debtor will have built up more equity in the property,
and alternatively, one that would occur approximately three years
after the effective date and would rely on Thanos extracting
equity from another property either he or Imperial owns and using
those funds to facilitate the refinancing of the debtor's
property.  Although the court found the debtor's evidence more
persuasive with respect to its ability to refinance in the long-
term by building equity in the property, the court disagrees with
Stabilis's characterization of the debtor's overall showing with
respect to refinancing as merely speculative.

First, in the event the debtor waits ten years to refinance,
the debtor's evidence showed that, even if the property does not
appreciate in value, monthly payments to Stabilis coupled with
Thanos's monthly equity contributions of $1,000 should bring the
loan to value ratio up to approximately 84%, a loan to value
ratio that would make refinancing a realistic possibility.  The
evidence also showed that it was likely the property would
appreciate to some degree, and if that occurs, the loan to value

20

ratio will be that much more favorable for the debtor's prospects
for refinancing.

Thanos also testified that he hopes to refinance as early as
three years after the effective date of the plan.  Thanos
explained that he owns a property on Connecticut Avenue in which
he has substantial equity, and in three years, he should be in a
position to refinance and extract between $250,00 and $300,000
from that property.  The court agrees that the evidence of
Thanos's ability to refinance the Connecticut Avenue property is
thin, but it lends support to the debtor's overall showing that
its principal, Thanos, is motivated to perform under the plan and
the debtor may even have the ability to refinance earlier than
proposed in the plan.  That said, the plan requires a balloon
payment in ten years, not three, making it unnecessary for the
debtor to prove that Thanos is obligated to and has the ability
to refinance the Connecticut Avenue property in three years to
fund the balloon payment.  The debtor showed a reasonable
likelihood of being able to refinance the debtor's property in
ten years by virtue of the increased loan to value ratio, and
that was enough for the debtor to satisfy its burden with respect
to this factor in assessing feasibility.

IV

It is

ORDERED that Stabilis Fund II, LLC's Motion for

Reconsideration is DENIED.


                                        [Signed and dated above.]

Copies to: Recipients of e-notification of filing.